1 | DANIEL T. HAYWARD, ESQ. #5986
MICHAEL LARGE, ESQ. #10119
2 | LAXALT & NOMURA, LTD.
9600 Gateway Drive
3 | Reno, Nevada 89521
dhayward@laxalt-nomura.com
4 | Telephone: (775) 322-1170
Facsimile: (775) 322-1865
5

6 | UNITED STATES DISTRICT COURT

7 | DISTRICT OF NEVADA

8 | DAVID LEAR and SANDRA L.            Case No.  3:07-cv-00176-BES-VPC
9 | LEAR, Husband and Wife,

10 |          Plaintiffs,
11 |      v.                            **MOTION TO DISMISS OF
                                       DEFENDANTS MARI TIERNEY,**
12 | MARI TIERNEY a/k/a MARIE           **THE COMMERCE GUILD, INC.,**
TIERNEY, an individual; THE            **AND CREATIVE MARKETING**
13 | COMMERCE GUILD, INC., a Nevada     **SOLUTIONS, INC. PURSUANT**
corporation; CREATIVE                  **TO FRCP 12(b)(6), FRCP 12(e),**
14 | MARKETING SOLUTIONS, INC., a       **FRCP 9(b) AND 15 U.S.C. § 78u-4(b)**
Nevada corporation; DALE R.
15 | HARELIK, an individual; GARY
LASATER, an individual; HARELIK
16 | DIVERSIFIED INTERESTS, INC., a
Nevada corporation; TELETRADE
17 | INTERNATIONAL, INC., a Nevada
corporation; DOES 1 through 10,
18 | inclusive; and ROE CORPORATIONS
1 through 10, inclusive,
19
20 |          Defendants.
21 | _____/

22 |      Defendants, MARI TIERNEY, THE COMMERCE GUILD, INC., and CREATIVE

23 | MARKETING SOLUTIONS, INC., by and through their counsel, LAXALT & NOMURA,

24 | LTD., move the Court for its order dismissing Plaintiffs' Complaint on file herein without leave

25 | to replead, and for such other and further relief as the Court deems appropriate.  This motion is

26
27 | based upon FRCP 12(b)(6), FRCP 12(e), FRCP 9(b), 15 U.S.C. § 78u-4(b), the pleadings and

28 | papers on file herein, and the following memorandum of points and authorities.

1  DATED this 21st day of May, 2007.

2  　　　　　　　　　　　　　　　　LAXALT & NOMURA, LTD

3

4  　　　　　　　　　By:

5  　　　　　　　　　　　　Daniel T. Hayward, Esq. #5986
   　　　　　　　　　　　　Michael Large, Esq. #10119
6  　　　　　　　　　　　　9600 Gateway Drive
   　　　　　　　　　　　　Reno, Nevada 89521
7  　　　　　　　　　　　　Tel: (775) 322-1170
   　　　　　　　　　　　　Fax: (775) 322-1865
8  　　　　　　　　　　　　Attorneys for Defendants

9  　　　　　　　　　　　　**INTRODUCTION**

10  　　　　Plaintiffs David and Sandra Lear have filed what can only be described as a rambling,

11
   angry litany of unsupported, conclusory allegations, replete with gratuitous personal insults and
12
   multiple prayers for an eight-figure damage award, all of which is based on a $250,000
13
14  convertible note to which only one of the numerous Defendants is even a party.  When all of the

15  fantastic, speculative argument is stripped away, it becomes evident that Plaintiffs' complaint is

16  devoid of the factual allegations required to survive scrutiny under FRCP 12(b)(6), and is in

17  clear violation of FRCP 8(a) and (e), FRCP 9(b), and 15 U.S.C. § 78u-4(b).

18
   　　　　Notably absent from Plaintiff's 38-page complaint is any allegation describing the
19
   material terms of the operative convertible note between Creative Marketing Solutions, Inc.
20
21  (hereinafter, "CMS") and the David R. Lear and Sandra L. Lear Family Trust (hereinafter, the

22  "Lear Family Trust") which supposedly gave rise to all of this.  Accordingly, Defendants ask

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1   this Court to consider the terms of note, which is attached hereto as Exhibit A along with the

2   authenticating affidavit of CMS's sole shareholder and CEO, Mari Tierney.[1]

3   **ARGUMENT**

4   **A.    LEGAL STANDARD**

5   As explained by this Court in one of its most recent pronouncements on the subject:

6   
7   Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a court may dismiss
    a complaint for "failure to state a claim upon which relief can be granted." "[A]
8   complaint should not be dismissed for failure to state a claim unless it appears beyond
    doubt that the plaintiff can prove no set of facts in support of his claim which would
9   entitle him to relief." *Yamaguchi v. U.S. Dept. of the Air Force*, 109 F.3d 1475, 1481
    (9th Cir. 1997) (citation omitted). All factual allegations set forth in the complaint "are
10  taken as true and construed in the light most favorable to [p]laintiffs." *Epstein v. Wash.
    Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1999). Although courts assume the facts
11  alleged as true, courts do not "assume the truth of legal conclusions merely because they
    are cast in the form of factual allegation." *W. Mining Council v. Watt*, 643 F.2d 618, 624
12  (9th Cir. 1981). Dismissal is appropriate "only if it is clear that no relief could be
    granted under any set of facts that could be proven consistent with the allegations."
13  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988) (citation omitted).

14  *Artist Hous. Holdings, Inc. v. Davi Skin, Inc.*, 2007 U.S. Dist. LEXIS 25345, *2-3 (D. Nev.
15
16  2007). When reading Plaintiffs' highly argumentative pleading in this case, it is important to

17  bear in mind that "the court is not required to accept legal conclusions cast in the form of

18  factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."

19  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994), citing *Papasan v. Allain*,

20  478 U.S. 265, 286 (1986).

21
22
23  ----
24  [1]   The Court may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice without converting the motion to dismiss into a motion for summary
25  judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); see also *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document
26  or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908.  "If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents
27  referred to in the complaint to show that they do not support plaintiff's claim." *In re Silicon Storage Tech, Inc., Sec. Litig.*, 2007 U.S. Dist. LEXIS 21953 (N.D. Cal. 2007), citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688-
28  89 (9th Cir. 2001).

1

2

**B.**   **Plaintiff's allegations of fraud and violations of federal and state securities laws and regulations are so disconnected, incomplete and confusing that dismissal is mandated by FRCP 8(a) and (e), FRCP 9(b), and 15 U.S.C. § 78u-4(b).**

3     Plaintiffs' federal securities claims are governed by both FRCP 9(b) and Private

4   Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(A).  FRCP 9(b)

5   requires Plaintiffs to allege specific facts regarding the fraudulent activity, such as the time,

6   date, place, and content of the alleged fraudulent representation, how or why the representation

7
    was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In*
8
9   *re GlenFed Sec. Litig.,* 42 F.3d 1541, 1547-49 (9th Cir. 1994).  "Because the plaintiff must set

10   forth what is false or misleading about a particular statement, he must do more than simply

11   allege the neutral facts necessary to identify the transaction; he must also explain why the

12   disputed statement was untrue or misleading at the time it was made."  *In re Silicon Storage*

13
     *Tech, Inc.,* 2007 LEXIS 29153 at 12-13 (N.D. Cal. 2007), citing *Yourish v. California Amplifier*,
14
15   191 F.3d 983, 992-93 (9th Cir. 1999).  The PSLRA was enacted in order to "establish uniform

16   and stringent pleading requirements for securities fraud actions, and to put an end to the

17   practice of pleading 'fraud by hindsight.'"  *Id.* at 12-13, citing *In re Silicon Graphics*, 183 F.3d

18   at 988.  "The PSLRA heightened the pleading requirements in private securities fraud litigation

19   by requiring that the complaint plead both falsity and scienter with particularity."  *Id.* at 12-13,

20   citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002).  "If the complaint

21
     does not satisfy these pleading requirements, the court, upon motion of the defendant, must
22
23   dismiss the complaint."  *Id.* at 12-13 (emphasis supplied), citing 15 U.S.C. § 78u-4(b)(3)(A).

24     Plaintiffs' allegations of securities fraud are disjointed, repetitive, incomplete, and

25   difficult to follow.  At page 6 of the complaint, the make the unsupported claim that Defendants

26   "set up the business entities to mislead Plaintiffs and induce Plaintiffs to invest and become

27   involved in Defendants' schemes and scams ..." and that they "distributed false and misleading

28

1   information." At page 7, they contend Ms. Tierney described the "investment opportunity" as

2   "lucrative and confidential" and that it was somehow material to Plaintiffs decision to loan

3   CMS money that Tierney had received ownership in The Commerce Guild ("TCG") for no

4   consideration. They go on to allege, without support, that the "TCG Business Suite" plan

5   involves the "reworking/re-cycling/'massaging'"of documents used in "other scams" without

6   identifying how or why this is the case, or describing the alleged other "scams". Page 8 sets

7   forth four argumentative and immaterial allegations --- other money transfer systems exist,

8   Defendants did not develop a written business plan, and Ms. Tierney was allegedly in debt and

9   

10   had been involved in an unrelated failed venture --- which are either vague and/or immaterial.

11   Plaintiffs then make the irrelevant allegation that they were told that TCG --- not CMS, the

12   company to which they loaned their money --- would make hundreds of millions of dollars, that

13   they would receive five percent of the total equity in TCG (a statement belied by the plain

14   language of the convertible note with CMS), and that dividends would be paid to Plaintiffs

15   

16   (again, a statement not supported by the plain language of the note). In Plaintiffs' First Cause

17   of Action, they vaguely allege that Defendants failed to disclose that they would "benefit

18   financially" Plaintiffs' "investment," and that they intended to use Plaintiffs' monies to pay

19   personal debts and buy personal assets. More disconnected, repetitive allegations follow on

20   pages 12, 13, 14, 15, 16 and 17, none of which are tied to any particular federal or state

21   securities law or regulation (apparently, that is a task for Defendants and the Court to

22   

23   complete).

24          To the contrary, neither Defendants nor the Court are required to puzzle together the

25   elements of Plaintiffs' alleged securities fraud case, nor are they required to ascertain which

26   federal or state securities statute or regulation Plaintiffs purport to sue under with respect to

27   each such allegation. Plaintiffs have failed to identify the requisite elements of these causes of

28

1   action with respect to each alleged fraudulent statement, and therefore their claims must be

2   dismissed pursuant to FRCP 12(b)(6), FRCP 9(b) and 15 U.S.C. § 78u-4(b)(3)(A).  In the

3   alternative, Plaintiffs should be ordered pursuant to FRCP 12(e) to set forth an understandable,

4   cogent description of the theories and facts they intend to allege.

5       Recent securities decisions demonstrate a trend toward enforcing the requirement of

6   clear, specific allegations of fact:

7

8       "In short, plaintiffs have left it up to defendants and the court to try to figure out
        exactly what the misleading statements are, and to match the statements up with the
9       reasons they are false or misleading." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d
        833, 841 (N.D. Cal. 2000). "The predictable demands of reviewing such a complaint
10      abuse judicial resources.  'When attorneys admitted to practice in Federal courts prepare
        complaints, neither the Court nor opposing counsel should be required to expend time
11      and effort searching through large masses of conclusory, argumentative, evidentiary and
        other extraneous allegations in order to discover whether the essentials of claims
12      asserted can be found in such a melange.'" *Wenger*, 2 F. Supp. 2d at 1243-44 (quoting
        *Silver v. Queen's Hospital*, 53 F.R.D. 223, 226 (D.Haw. 1971)). "'It is the duty and
13      responsibility, especially of experienced counsel, to state those essentials in short, plain,
        and non-redundant allegations.'"  2 F. Supp. 2d at 1244 (quoting *Silver*, 53 F.R.D. at
14      226).

15                                        * * *

16          The Court finds that plaintiffs have failed to set forth a "short and plain"
        statement of their claims in violation of Rule 8(a) and have failed to make each
17      allegation "simple, concise and direct" in violation of Rule 8(e).  Moreover in
        contravention of the PSLRA, plaintiffs have failed to craft a complaint in such a way
18      that a reader can, without undue effort, divine precisely which statements (or portions of
        statements) are alleged to be false or misleading, and the reason or reasons why each
19      statement is false or misleading. The Court therefore GRANTS the Splash defendants'
        motion to dismiss the SAC in its entirety.  Given plaintiffs' failure in three successive
20      attempts to satisfy the pleading requirements of Rule 8 and the PSLRA, and based upon
        other deficiencies set forth below, the Court finds that further amendment would be
21      futile. Accordingly, the Second Amended Complaint hereby is dismissed with prejudice.

22

23  *In re Splash Tech. Holding Secs. Litig.*, 160 F. Supp. 2d 1059, 1074-75 (N.D. Cal. 2001).  See

24  also *In re Silicone Storage Tech, Inc.*, 2007 LEXIS 21953 at 32 ("District courts in the Ninth

25  Circuit have repeatedly chastised plaintiffs in securities fraud suits for this kind of 'puzzle-

26  style' pleading").

27  **C.    Each of Plaintiff's 16 enumerated claims is subject to dismissal by this Court.**

28

**1/4.   Securities fraud.[2]**

In the First and Fourth Causes of Action, Plaintiffs allege that Defendants have committed securities fraud. Specifically, in the First Cause of Action, Plaintiffs allege violations of the Securities Act of 1933, the Securities Exchange Act of 1934, Section 10(b) and Rules 10b-3 and 10b-5 of the General Rules and Regulations as promulgated by the SEC, 15 U.S.C. § 78j and the rules and regulations of the Nevada State Securities Division. In the Fourth Cause of Action, Plaintiffs allege violations of Sections 5 and 12 of the Securities Act of 1933, the Securities Exchange Act of 1934, Rules 10b-3 and 10b-5 of the SEC, 15 U.S.C. § 78j; Rules of the NASD and Nevada state securities laws including Chapter 90.[3]

At the outset, Defendants must point out that the $250,000 note is strictly between CMS and the Lear Family Trust.[4] Accordingly, before proceeding further in its analysis, the Court should resolve to dismiss the First and Fourth Causes of Action as against TCG and Mari Tierney, who are not even parties to the alleged transaction.

Further, in order to compel CMS to convert the note repayment obligation to CMS common stock, the Lear Family Trust was expressly required by Section 2.d of the note to deliver it to CMS:

> The Company [CMS] will not be obligated to issue certificates evidencing the shares of common stock unless this Convertible Note is either delivered to the Company or the Holder notifies the Company that this convertible note has been lost, stolen or destroyed and executes an agreement satisfactory to the Company to

---

[2]   The numeric references under the Section B heading track the number of Plaintiffs' various claims. "1/4" refers to claims number 1 and 4 in Plaintiffs' complaint.

[3]   Rule 10b-3 (17 C.F.R. 240.10b-3) prohibits deceptive or fraudulent conduct by any "broker or dealer," and is clearly not implicated by limited private transaction such as this. Further, although it is unclear what specific provision of Nevada's state securities laws Plaintiffs allege Defendants have violated, the fact is that after Plaintiffs' RICO and federal securities claims have been dismissed, this Court should dismiss the entire case for want of subject matter jurisdiction. 28 U.S.C. 1331.

[4]   Plaintiffs have not alleged that they are the trustees of the Lear Family Trust, therefore have standing to sue on its behalf.

1

indemnify the Company from any loss incurred by it in connection with this Convertible Note.

2

3

Plaintiffs have failed to allege that the Lear Family Trust has satisfied this express condition

4

precedent.  Therefore, they are unable as a matter of basic contract interpretation to establish

5

that an obligation to issue certificates evidencing shares of common stock has arisen.  Absent an

6

obligation to convert the repayment obligation to stock, the note does not become due until

7

September 30, 2011.  (Ex. A, sec. 1)

8

9

### a.   Under the plain language of the note and SEC Rule 144, this transaction is exempt from the Securities Act of 1933.

10

The complaint contains a great deal of vitriol directed at Defendants, but what it does

11

not contain is a viable claim for relief under the federal securities statutes.  "[T]he mere fact

12

that securities are involved does not convert a state claim into a basis for federal jurisdiction."

13

*Dopp v. Franklin National Bank*, 374 F. Supp. 904, 910 (S.D.N.Y. 1974) (emphasis supplied).

14

It is undisputed that the Lear Family Trust invested $250,000 in CMS on or about

15

September 25, 2006, memorialized by a convertible note issued by CMS.  (Ex. A)  This note

16

bears the signatures of Plaintiffs David and Sandra Lear on behalf of the Lear Family Trust, and

17

Defendant Mari Tierney on behalf of CMS. (Ex. A, p. 4)  It has a due date of September 30,

18

2011 for payment of the outstanding principle balance and any interest owing.  (Ex. A, sec. 1)

19

Section 2 of the note governs the right of the note holder, the Lear Family Trust, to

20

convert the note into "shares of Creative Marketing Solutions, Inc. common stock equivalent to

21

5% ownership as of the date of this Agreement."  (Ex. A, sec. 2.a and 2.c)  Section 5 of the note

22

specifically states:

23

24

5.   Representations and Warranties of the Holder.  The Holder represents and warrants to the Company as follows:

25

26

27

28

(a)   Investment Intent.  The Holder is acquiring this Convertible Note and any securities acquired hereunder for investment for the Holder's own account and may resell to anyone, or assign any distribution thereof to members of "Holder."  **The holder understands that the Securities have not been, and will not be, registered under the Securities Act of 1933, as amended (the "Act").  The Holder understands that the Securities have not been registered under the Act by reason of  a specific exemption from the**

**registration provisions of the Act that depends upon, among other things, the bona fide nature of the investment intent as expressed herein.** The Holder understands and agrees that the Securities shall not be sold, pledged, hypothecated or otherwise transferred unless registered under the Act and applicable state securities laws or an exemption from registration is available and that each certificate or other document evidencing or representing the Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

THE SECURITIES OF THE COMPANY EVIDENCED BY THE CERTIFICATE **HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION STATE SECURITIES LAWS**. THESE SECURITIES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR ASSIGNED OR A SECURITY INTEREST CREATED THEREIN, UNLESS THE PURCHASER, TRANSFEREE, ASSIGNEE, PLEDGEE OR HOLDER OF SUCH SECURITY INTEREST COMPLIES WITH ALL STATE AND FEDERAL SECURITIES LAWS (I.E., SUCH SHARES ARE REGISTERED UNDER SUCH LAWS OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE THEREUNDER) AND UNLESS THE SELLER, TRANSFEROR, ASSIGNOR, PLEDGOR OR GRANTOR OF SUCH SECURITY INTEREST PROVIDES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT THE TRANSACTION CONTEMPLATED WOULD NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS.

(b)     Rule 144.  **The Holder acknowledges that the Securities must be held indefinitely unless subsequently registered under the Act, or unless an exemption from such registration is available. The Holder is aware of the provisions of Rules 144 and 144A promulgated under the Act that permit limited resale of securities purchased in a private placement subject to the satisfaction of certain conditions**, including, among other things, in most circumstances (i) the availability of certain current public information about the Company, (ii) the resale occurring not less than one (1) year after a party has purchased and fully paid for the shares, (iii) the sale being effected through a "broker's transaction" or in the transactions directly with a "market Maker" (as provided by Rule 144(f)), and (iv) the number of shares being sold during any three month period not exceeding specified limitations.

\* \* \*

(d)     Speculative Investments.     **The Holder is aware that an investment in the Securities is highly speculative and subject to substantial risks.** The Holder has adequate means of providing for its current needs and possible contingencies, and is able to bear the high degree of economic risk of the investment, including, but not limited to, **the possibility of the complete loss of the Holder's entire investment**, and the limited transferability of the Securities, which may make the liquidation of this investment impossible for the indefinite future....

LAXALT & NOMURA.
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

9

1  (Ex. A, emphasis supplied)

2  Thus, the contract entered into between the Lear Family Trust and CMS specifically

3  provides that any securities obtained from the conversion of the note are <u>not</u> registered and are

4  instead subject to SEC Rule 144. Rule 144, promulgated by the SEC under the 1933 Act,

5  permits the sale of restricted and controlled securities, without registration, under limited

6  circumstances. Rule 144(a) (3) designates several categories of securities as "restricted

7  securities" which are exempt from the 1993 Act, including one category --- Rule 144 (a) (3) (i)

8  --- which applies here: "Securities that are acquired directly or indirectly from the issuer, or

9  from an affiliate of the issuer, in a transaction or chain of transactions not involving any public

10  offering." Plaintiffs have not alleged a "public offering", but rather have alleged facts

11  supporting an isolated transaction between CMS and the Lears. Accordingly, Plaintiffs alleged

12  claim under the 1933 Act fails as a matter of law.

13  **b.   Both the alleged "security" and the alleged "transaction" are**
14  **exempt from the Securities Act of 1933 for additional reasons.**

15  Setting aside the issue of the Rule 144 exemption, the 1933 Act does not apply because

16  (1) the Convertible Note was a purely intrastate offering and (2) the investment was not a

17  public offering.

18  
19  **1.   The 1933 Act does not apply to purely intrastate offerings.**

20  Plaintiffs have alleged that they entered into an "investment contract" for $250,000 with

21  Defendants TCG and/or CMS. (Complaint, p.3, para. C.i)[5] According to Plaintiffs, this

22  investment contract constitutes a "security" under the 1933 Act. Yet even presuming this is

23  true, the fact remains that the transaction was purely <u>intrastate</u> and therefore the 1933 Act does

24  not apply.

25  
26  
27  [5]   Obviously, TCG is <u>not</u> a party to the convertible note. How Plaintiffs could allege otherwise is puzzling, to put it mildly. (<u>See</u> Ex. A) Equally confusing are Plaintiffs' repeated references to "TCG securities," when in fact the note provides only for potential conversion into CMS stock. (<u>Id.</u>, sec. 2)

28  

LAXALT & NOMURA.
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

10

1   15 U.S.C. § 77c(a)(11) (section 3(a)(11) of the 1933 Act) provides "that the provisions

2   of the 1933 Act do not apply to securities sold intrastate." *Matek v. Murat*, 862 F.2d 720, 731

3   n.17 (9th Cir. 1988).  Section 3(a)(11) provides:

4       Any security which is a part of an issue offered and sold only to persons resident
        within a single State or Territory, where the issuer of such security is a person
5       resident and doing business within or, if a corporation, incorporated by and
6       doing business within, such State or Territory.

7   15 U.S.C. § 77c(a)(11).

8       The complaint states that the Plaintiffs are both residents of the State of Nevada.

9   (Complaint, p. 2, para. B)  Plaintiffs allege that TCG is a Nevada corporation.   (*Id.*, p. 2, para.

10  A)  Although Plaintiffs fail to allege it, CMS is a Nevada corporation.  (Aff. of CMS's CEO,

11
    Mari Tierney, attached)  Thus, according to Plaintiffs' own allegations, the investment contract
12
13  --- the alleged "security" --- was sold only to Nevada residents by an issuer, CMS, which was

14  also a Nevada resident.  Accordingly, under Section 3(a)(11), the 1933 Act does not apply

15  because the transaction is purely intrastate.

16              **2.      The 1933 Act does not apply to private offerings.**

17      The 1933 Act, 15 U.S.C. § 77a *et seq.*, "was designed to provide investors with full

18
    disclosure of material information concerning public offerings of securities in commerce ..."
19
20  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (emphasis added).  15 U.S.C. § 77d

21  exempts certain transactions from Section 5 of the 1933 Act.[6]  15 U.S.C. § 77d(2) (section

22  4(a)(2) of the 1933 Act) exempts "transactions by an issuer not involving any public offering."

23

24

25  ───────────────
    [6]    Section 5 of the 1933 Act provides that "[u]nless a registration statement is in effect as to a security, it
    shall be unlawful for any person, directly or indirectly –
26          (1) to make use of any means or instruments of transportation or communication in interstate commerce
    or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or
27          (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or
    instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. §
    77e(a).  These prohibitions are actionable under Section 12 of the 1933 Act unless either the "security" or
    "transaction" is exempted.

1    The Supreme Court case of *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953), provides

2 a framework for analyzing whether an offering is private or public. See *West v. Innotrac Corp.*,

3 463 F. Supp. 2d 1169, 1175 (D. Nev. 2006) (analyzing public versus private offerings). Under

4 *Ralston Purina*, whether an offering is public or private turns on whether the particular class of

5 persons affected needs the protection of the Act. *Id.* at 126. Courts have developed flexible

6 tests to determine whether a transaction involves a public offering. These tests focus on four

7

8 factors: "(1) the number of offerees; (2) the sophistication of the offerees; (3) the size and

9 manner of the offering; and (4) the relationship of the offerees to the issuer." *S.E.C. v. Murphy*,

10 626 F.2d 633, 644-45 (9th Cir. 1980) (citations omitted).

11    In the present case, Plaintiffs have not pled the facts necessary to establish that this

12 transaction rises to the level of a public offering. It is self-evident from the face of the note that

13 there was only a single offeree, and there are no facts pled suggesting that the trustees of the

14
Lear Family Trust were unsophisticated, or that the "offering" was relatively substantial in size,
15
16 or that the relationship between the offerees and CMS was such that the transaction should be

17 regarded as a public offering. The 1933 Act is not meant to protect a purely private transaction

18 like the present one. Instead, it is meant to protect the general public during a public offering.

19                c.    **Plaintiffs' claim also fails to the extent it alleges a violation of the**
**1934**              **Act, including Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and**
20                      **SEC Rules 10b-3 and 10b-5.**

21    Plaintiffs' securities claims allege a general violation of Securities Exchange Act of

22
1934 and specifically Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and SEC Rules 10b-3
23
24 and 10b-5. To plead securities fraud under Section 10(b) of the 1934 Act, plaintiffs must allege

25 (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which

26 plaintiffs relied (5) which proximately caused the plaintiffs' injury. *DSAM Global Value Fund*

27 *v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002). To plead a claim under Rule 10b-5,

28

1 Plaintiffs must plead and prove (1) a material misrepresentation (2) made with scienter (3) in

2 connection with the purchase or sale of a security, (4) transaction and loss causation, and (5)

3 economic loss. *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

4  To the extent the Court allows Plaintiff to move forward with their complaint, as pled, it

5 is subject to dismissal based upon the failure to allege an actionable misrepresentation.

6
7 Essentially, Plaintiffs appear to allege that Defendants promised them large returns on the Lear

8 Family Trust's $250,000 "safe" and "secure" investment, and that the monies would somehow

9 be used to advance a proprietary "money transfer technology" known as the "TCG Business

10 Suite." (Complaint, *passim*)  However, these alleged oral statements are contradicted by the

11 express notification in the convertible note that the investment was "highly speculative" and

12 "subject to substantial risks." (There is even a <u>section heading</u> entitled "Speculative

13 Investment". (Ex. A, sec. 5.d)  They are also contradicted by the fact that the note does not

14
15 promise large returns --- or any returns at all.  It promises repayment on September 30, 2011

16 with "8% per annum interest" <u>or</u> conversion to CMS common stock. (Ex. A)

17  The alleged oral sales pitch is simply not actionable under federal securities laws and

18 regulations.  As explained by the United States District Court for the Northern District of

19 California on March 9, 2007:

20  [C][ourts have routinely held that vague or amorphous statements of optimism and
21 "puffing" about a company or a product are not actionable. <u>See</u>, <u>e.g.</u>, *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1197-99 (D. Nev. 1999); *Wenger v. Lumisys, Inc.*,
22 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp.
23 1217, 1236 (N.D. Cal. 1994). "Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that a reasonable person would deem
24 important to a securities investment decision." *In re Ligand Pharms., Inc. Sec. Litig.*, 2005 WL 2461151, at *19 (S.D. Cal., Sept. 27, 2005) (citation and quotation omitted).
25 Such vague statements cannot be said to "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC*
26 *Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757
27 (1976) (citation omitted).

28

1   *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 U.S. Dist. LEXIS 21953, 62-63 (N.D. Cal.

2   2007).[7]

3      Between the clear and unambiguous language of the convertible note, and the

4   unactionable nature of Defendants' alleged representations during CMS's presentation to the

5   Lear Family Trust, it is clear that Plaintiffs have failed to meet the very high pleading threshold

6   presented by the applicable federal and state securities laws and regulations. Accordingly, these

7   claims must be dismissed.

8

9      **2.    Common law fraud.**

10     Plaintiffs contend in their second claim for relief that "Defendant Tierney":

11       a.      "[C]oncealed the fact that the Plaintiffs' invested monies would be

12   transferred to and through various bank accounts to and for the financial benefit, directly or

13   indirectly, of Defendants TIERNEY, HARELIK and LASATER.  (Complaint, p. 20)

14
         b.      "[C]oncealed her involvement in the fraudulent schemes and accounts
15
     described in this Complaint ...."  (Complaint, p. 20)
16

17     Plaintiffs then claim that although Ms. Tierney is the only one alleged to have

18   "concealed" these facts, Defendants Tierney, Harelik and Lasater were under a duty to disclose

19   "the material facts that they would benefit financially from Plaintiffs' purchase of the TCG

20   securities purchased by Plaintiff, and that Defendants TIERNEY and HARELIK were engaging

21   in the courses of conduct described in this Complaint ...."  (Complaint, p. 20)  Plaintiffs allege

22   that if they had known "the truth about the conduct of Defendants TIERNEY, HARELIK and

23
     LASATER, as described in this Complaint, they would not have purchased their TCG
24

25

26   ⁷    *Silicon Storage Tech, Inc.*, involved a suit by investors under Section 10(b) of the 1934 Act (15 U.S.C.
     78j(b), as well as Rule 10b-5 (17 C.F.R. 240.10b-5) and Section 20(a) of the Exchange Act (15 U.S.C. 78t(a)), in
27   which they alleged that the company and controlling persons issued false reports in connection with the company's
     quarterly release of financial results.  The court dismissed the plaintiffs' second amended complaint with prejudice
28   due to failure to plead facts demonstrating that the alleged fraudulent statements were false and misleading.  *Id.*,
     2007 U.S. Dist. LEXIS 21953 at 96.

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

14

1   securities," and as a result they have been damaged to the tune of at least $10 million (because
2   they "invested" $250,000).  (Complaint, p. 20)

3   Fraudulent concealment requires proof of:  (1) concealment or suppression of a material
4   fact; (2) a duty by the Defendants to disclose the fact to Plaintiffs; (3) intentional concealment
5   of the fact by Defendants with the intent to defraud Plaintiffs; (4) lack of awareness by
6   Plaintiffs of the concealed fact, and that Plaintiffs would not have acted as they did if they had
7   known of the concealed fact; and (5) damages as a result of the concealment of the fact. Nev.
8   Pattern Jury Instr. 9.03.
9

10   Although it purports to be directed at "All Defendants", this claim does not allege that
11   moving Defendants TCG and CMS concealed any material facts from Plaintiffs --- only that
12   Ms. Tierney did.  However, it is self-evident from the subject convertible note attached as
13   Exhibit A that the parties to the agreement were the Lear Family Trust and CMS, not TCG or
14   Ms. Tierney.  Ms. Tierney, individually, did not owe the Lears a "duty" to tell them anything at
15   all, and Plaintiffs have not alleged any fraudulent conduct by CMS or TCG. Accordingly, it
16   should be dismissed.
17

18   Further, it is hopelessly unclear exactly what the Defendants supposedly concealed.
19   FRCP 9(b) requires Plaintiffs to plead fraud with specificity.  Instead, they have incorporated
20   by reference 19 pages of conclusory allegations, labeled the contents as "material facts", and
21   declared that the Defendants had a duty to disclose these vague, unspecified facts.  (Complaint,
22   p. 20) Apparently, the claim is that Defendants eventually did something inappropriate with the
23   monies, and they should have told the Lear Family Trust in advance that they intended to do it.
24   Then, the Lears would have refused to invest based upon being told of future events that had
25   not yet even occurred.  Of course, this is utter nonsense.  Obviously, one may not predicate a
26   claim for nondisclosure of material "fact" upon failure to disclose events which have not yet
27

28

1   occurred.  If one breaches a contract or tortiously injuries someone's interest, the remedy is an

2   appropriate claim for that conduct --- not a claim for "fraudulently" not predicting and

3   declaring that the alleged wrongful actor would one day commit the wrongful act.

4       The only specific act of concealment pled is that Ms. Tierney failed to disclose that she,

5   Mr. Harelik and Mr. Lasater would supposedly benefit financially from Plaintiffs' purchase of

6   the TCG securities.  On its face, this allegation fails to state a cognizable claim.  Ms. Tierney

7   and Mr. Harelik were the sole shareholders of companies owning 40 percent of the shares of

8   TCG.  Mr. Lasater's company owned another 20 percent.  (The balance of the shares was

9   retained by TCG and not issued to any sharedholders.)  Of course the shareholders of TCG

11  would potentially "benefit financially" from Plaintiffs' loan of $250,000 to CMS to the extent

12  that loan was used to further TCG's business.  It is not the aim of any business, or its

13  shareholders, to not prosper financially.

### b.   Plaintiffs' fraud claim is barred by the parol evidence rule and the fact that the alleged misstatements are mere "puffery".

16      Each of Plaintiffs' claims --- including the common law fraud claim --- arising out of

17  the allegation that the Lear Family Trust's "investment" was actually in TCG rather than CMS,

18  and that Defendants promised them the moon and the stars but failed to deliver, are barred by

19  the parol evidence rule.[8]

21          Generally, parol evidence may not be used to contradict the terms of a written
    contractual agreement.  "The parol evidence rule forbids the reception of evidence

22  which would vary or contradict the contract, since all prior negotiations and agreements

---

[8]    " The parol evidence rule, NRS 104.2202, provides as follows:

25  "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set
    forth in writing intended by the parties as a final expression of their agreement with respect to such terms as are

26  included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral
    agreement but may be explained or supplemented:

27      1.    By course of performance, course of dealing or usage of trade (NRS 104.1303); and
        2.    By evidence of consistent additional terms unless the court finds the writing to have been

28  intended also as a complete and exclusive statement of the terms of the agreement.

LAXALT & NOMURA.
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

are deemed to have been merged therein." *Daly v. Del E. Webb Corp.*, 96 Nev. 359, 361, 609 P.2d 319, 320 (1980). Where "a written contract is clear and unambiguous on its face, extraneous evidence cannot be introduced to explain its meaning." *Geo. B. Smith Chemical v. Simon*, 92 Nev. 580, 582, 555 P.2d 216, 216 (1976).

*Kaldi v. Farmers Ins. Exch.*, 117 Nev. 273, 281, 21 P.3d 16 (2001). The Court in *Kaldi* went on to explain that evidence of a party's intent (such as the Lears' assertion that they <u>thought</u> they were investing in TCG, not CMS, and that they stood to make "millions") is not admissible to create ambiguity in an otherwise unambiguous written contract. "To do so would be to eviscerate the parol evidence rule." *Kaldi*, 117 Nev. at 282.

The convertible note at issue is clear and unambiguous.[9] The Lear Family Trust loaned CMS (and <u>not</u> TCG) $250,000, with repayment due on September 30, 2011 unless the Trust elected to convert the obligation to common stock in CMS. (Ex. A, sec. 1, 2) To do so, the Trust was required to deliver the note to CMS, or verify why the note could not be delivered. (*Id.*, sec. 2.d) The complaint fails to allege either. Further, the Trust was expressly advised that the note was exempt from the 1933 Act, that it must be held indefinitely unless subsequently registered under the Act, and that the investment was "<u>highly speculative and subject to substantial risks</u>." (*Id.*, sec. 5) Plaintiffs' voluminous, conclusory allegations are contradicted by the unambiguous language of the note itself, and because these allegations are parol evidence, they cannot be considered by the Court. Plaintiffs' fraud claim, and all other claims at odds with the language of the convertible note, fail as a matter of law.

To the extent, if any, Plaintiffs allegations of misrepresentation are not barred by the parol evidence rule, they fall short of establishing actionable misrepresentation because on their face they are mere puffery that would not considered by a reasonable investor. *In re Stratosphere Corp. Sec. Litig.*, 66 F.Supp.2d 1182, 1198 (D. Nev. 1999). "Vague, hyperbolic

---

[9]   Whether a contract is integrated is a question of law. *Sullivan v. Mass. Mut. Life Ins. Co.*, 611 F.2d 261, 264 (9th Cir.1979).

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

1   statements of puffery lack the requisite materiality to support securities fraud, since no

2   reasonable investor would rely on such statements." Accordingly, Plaintiff's fraud claim must

3   be dismissed.

4       **3.    Conversion.**

5       Plaintiffs contend that Defendants converted their "invested monies" to their own use.

6
    They also contend that the Defendants "profited from the investment by Plaintiffs in such
7
8   securities, all at the expense of and to the detriment of Plaintiffs."  (Complaint, p. 21)

9       Conversion requires proof that the true owner of property has been deprived of his

10  property by the unauthorized act of some person who assumes dominion or control over it.

11  *Studebaker Bros. Co. v. Witcher* 44 Nev. 442, 462, 195 P. 334 (1921), quoting *Velsian v. Lewis*,

12  15 Ore. 539, 16 P. 631, 3 Am. St. Rep. 188.[10]  Yet Plaintiffs have not alleged any facts

13  establishing an "unauthorized act of some person" which deprived them of their property.  To

14
    the contrary, they entered into an agreement with CMS (Exhibit A, attached), and wrote it a
15
16  check for $250,000, the repayment of which is not due until September 30, 2011 unless

17  Plaintiffs deliver the note to CMS and demand that it be converted into CMS common stock.

18  They have not pled that they delivered the note to CMS as required.  Thus, nothing could be

19  more "authorized" than CMS's retention of the loan principle.  As set forth above, Plaintiffs'

20  self-serving argument to the contrary is also barred by the parol evidence rule.

21
        **5.    Negligence.**
22
23      Plaintiffs next claim that Defendants negligently "breached their respective legal,

24  contractual and fiduciary duties to Plaintiffs" in various ways.  (Complaint, p. 23)  "To prevail

25  on a negligence theory, the plaintiff generally must show that: (1) the defendant had a duty to

26
    ---
27  [10]    See also, *Tyrone Pacific Int'l, Inc. v. MV Eurychili*, 658 F.2d 664, 666 (9th Cir. 1981). "The elements of
    the tort of conversion are well settled in California:  (1) plaintiffs' ownership or right to possession of the property
    at the time of the conversion; (2) defendants' conversion by a wrongful act or disposition of plaintiffs' property
28  rights; and (3) damages.  'Conversion' has been defined as 'any act of dominion wrongfully exerted over another's
    personal property in denial of or inconsistent with his rights therein.'"  *Id.* (internal citation omitted).

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

1  exercise due care towards the plaintiff; (2) the defendant breached the duty; (3) the breach was

2  an actual cause of the plaintiff's injury; (4) the breach was the proximate cause of the injury;

3  and (5) the plaintiff suffered damage." *Perez v. Las Vegas Medical Ctr.*, 107 Nev. 1, 4, 805 P.2d

4  589 (1991).

5      One negligently breaches the duty of ordinary care --- not a statute or regulation. To the

6  contrary, there can be no negligent breach an unspecified statute or other "legal obligation"

7  which does not provide a private right of action is not an actionable private wrong. Nor can

8  one be said to have negligently failed to complete a contract or fulfill an alleged fiduciary duty

9  --- such an act or omission is simply a breach of contract or a breach of fiduciary duty.

10

11      As explained above, Plaintiffs have utterly failed to allege a single duty which

12  Defendants allegedly breached which could give rise to a claim for negligence. There are no

13  facts to suggest that either Ms. Tierney, TCG, or even CMS owed Plaintiffs a "fiduciary" duty.

14  In any event, CMS was the only party to the note. Plaintiffs make vague reference to unnamed

15  "laws, rules and regulations" applying to Defendants' relationships with Plaintiffs, but fail to

16  specify what those unnamed provisions required of Defendants, that Plaintiffs have a private

17  right of action, or facts suggesting that Defendants actually violated whatever the unnamed

18  "laws, rules and regulations" required.

19

20      This claim is also barred by the economic loss rule. Although Plaintiffs later make

21  vague and unspecific reference to supposed "loss of sleep, depression, anxiety, nervous

22  disorders, physical illnesses and other maladies" in connection with their seventh claim for

23  relief (Complaint, para. 45), they did not allege any physical or emotional injury whatsoever in

24  connection with their negligence claim, or in any earlier paragraph incorporated into their

25

26

27

28

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

19

1  negligence claim. (Complaint, para. 33-37)  One may not recover contractual damages under a

2  negligence theory. *Calloway v. City of Reno,* 116 Nev. 250, 256, 993 P.2d 1259 (2000).[11]

3  Lastly, this claim is barred by operation of the parol evidence rule.  CMS's only duties

4  under the note were to either pay the amount due on September 30, 2011, or to convert the

5  repayment obligation into CMS common stock upon delivery of the note.  September 30, 2011

6  has not yet arrived, and Plaintiff has not pled that it delivered the note to CMS.  Accordingly,

7  this claim must be dismissed.

8

9  ## 6.   Breach of contract.

10  In order to sustain a claim for breach of contract against CMS, Plaintiffs must prove: 1)

11  the existence of a valid contract; 2) Plaintiffs' performance or excuse for nonperformance; 3)

12  breach by one or more Defendants; and 4) damage as a result of the breach. *Reichert v.*

13  *General Ins. Co. of America*, 442 P.2d 377, 381 (Cal. 1968).

14

15  Plaintiffs allege no facts establishing a contract between them and either Ms. Tierney or

16  TCG. The operative agreement, Exhibit A, clearly indicates that it is between CMS and the

17  Lear Family Trust, and no one else.  This claim must be dismissed as to TCG and Ms. Tierney.

18  Nor does the complaint support a claim of breach of contract against the contracting

19  party, CMS.  The express due date under the note is September 30, 2011.  (Ex. A, sec. 1)  There

20  is no provision for any periodic payments before that date, or any allegation that CMS has

21  failed to make any such payment. (Complaint, *passim*, and Ex. A)  The note does provide that

22  the holder, the Lear Family Trust, may "exercise an automatic conversion of this convertible

23  note to stock at any time, as outlined above in Section 2.a for the appropriate accumulated

24  amount of principle and interest." (Ex. A, sec. 2.c)  However, although Plaintiffs have alleged

25  that they demanded conversion of the note into stock, they have not alleged that they delivered

26

27

28

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

[11]  *Calloway* was superseded by statute with respect to construction defect cases by NRS Ch. 40.

1   the note to CMS as required by Section 2.d of the note.[12]  Accordingly, there is no breach of the

2   note under the facts pled in Plaintiffs' complaint, and this claim fails as a matter of law.

3   ### 7.   Intentional and/or negligent infliction of emotional distress.

4        In order to recover on a claim for intentional infliction of emotional distress, Plaintiffs

5   must establish:  (1) extreme and outrageous conduct with either the intention of, or reckless

6   disregard for, causing emotional distress, (2) severe or extreme emotional distress, and (3)

7
    actual or proximate causation.  *Mackintosh v. California Fed. Sav. & Loan Ass'n*, 113 Nev. 393,
8
9   408, 935 P.2d 1154 (1997), citing *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90 (1981).

10        The "extreme and outrageous conduct" requirement is an impossible hurdle for

11  Plaintiffs to overcome.  As the Nevada Supreme Court explained in *Maduike v. Agency Rent-A-*

12  *Car*, 114 Nev. 1, 953 P.2d 24 (1998), this requires proof of "extreme and outrageous conduct is

13  that which is 'outside all possible bounds of decency' and is regarded as 'utterly intolerable in a

14
    civilized community.'"  114 Nev. at 4, citing BAJI 12.74.[13]
15

16        Plaintiffs have not alleged facts demonstrating "extreme and outrageous conduct is that

17  which is 'outside all possible bounds of decency' and is regarded as 'utterly intolerable in a

18  civilized community.'"  *Maduike*, 114 Nev. at 4.  Essentially, they alleged a breach of contract.

19  Further, the simple fact is that the holder of the note is a family trust, not the Plaintiffs.  Even if

20  the Lears have properly sued CMS in their capacity as trustees of the Lear Family Trust, trust

21  instruments do not have feelings and emotions.

22
        If the Court permits Plaintiffs to alleged their own emotional distress as that of the Lear
23
24  Family Trust --- a curious legal concept --- this claim fails for an additional, equally compelling

25

26  12   Notably, failure to pay the amount due and failure to timely issue stock certificates to the holder upon
    conversion are the only two "default" events described in the note.  (Ex. A, sec. 4)

27
    13   See also *Restatement (Second) of Torts* § 46, Comment (d) (1965) ("extreme and outrageous" conduct is
28  that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of
    decency, and to be regarded as atrocious, and utterly intolerable in a civilized community").

1  reason.  Plaintiffs' weak, conclusory allegations of "loss of sleep, depression, anxiety, nervous

2  disorders, physical illnesses and other maladies" (Complaint, pp. 25-26) are not only patently

3  unbelievable, they are insufficient as a matter of law to support a claim for intentional infliction

4  of emotional distress.  On their face, these vague allegations of everyday issues do not rise to

5  the level "severe or extreme emotional distress."

6         For the same reasons, Plaintiffs may not recover for negligent infliction of emotional
7
   distress.  As set forth above, the allegedly injured party is (or should be) a trust instrument, not
8
9  a person.  Further, there is no allegation in the complaint that Plaintiffs' alleged emotional

10 distress was "secondary to physical injuries," or that it arose out of a "physical impact."

11 Therefore, they must plead and prove "'serious emotional distress' causing physical injury or

12 illness . . . ." *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 448, 956 P.2d 1382 (1998) (emphasis

13 supplied).  This is, conceptually, an even higher pleading and evidentiary bar than is the case
14
   with intentional infliction of emotional distress, because of the greater danger of exaggeration
15
16 absent intentional conduct and a physical impact.  *Barmettler* also illustrates that even

17 relatively significant emotional distress is insufficient as a matter of law to warrant recovery in

18 the absence of a physical impact.  The Court held that the trial judge correctly dismissed a

19 negligent infliction of emotional distress claim by an ex-employee who claims that his

20 termination caused him to "contemplate suicide" and "seek additional psychotherapy," after

21 determining that such symptoms did not satisfy this burden.  *Barmettler*, 114 Nev. at 443, 448
22
23 (emphasis supplied).

24        Plaintiffs' emotional distress claims also fail because the Nevada Supreme Court

25 recently adopted the rule that negligent infliction of emotional distress may not be based on an

26 underlying pecuniary loss.  "[W]e conclude that a claim for negligent infliction of emotional

27 distress cannot be premised upon an attorney's negligence in a legal malpractice case." *Kahn v.*

28

LAXALT & NOMURA.
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

22

1   *Morse & Mowbray*, 121 Nev. Adv. Op. 48, 117 P.3d 227, 237 (2005). "Additionally, we hold

2   that a claim of negligent infliction of emotional distress is inappropriate in the context of a legal

3   malpractice suit <u>when the harm resulted from pecuniary damages, even if the plaintiffs</u>

4   <u>demonstrated physical symptoms</u>.  The rationale behind such a rule is that "the primary interest

5   protected in legal malpractice actions is economic and <u>'serious emotional distress is not an</u>

6   <u>inevitable consequence of the loss of money</u>.'"  We agree with this rationale."  117 P.3d at 237

7   (internal citation omitted) (emphasis supplied).  While the specific context of the case was legal

8   malpractice, there is no reason to believe that its holding would not apply to other claims, such

9   as this one, involving only pecuniary loss.[14]

10

11          For each of these many reasons, Plaintiffs' infliction of emotional distress claims must

12   be dismissed.

13          **8/9.    Breach of covenant of good faith and fair dealing and "bad faith conduct."**

14          Every Nevada contract includes an implied duty of good faith and fair dealing.  <u>See</u>

15   *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1258, 969 P.2d 949, 956 (1998), <u>cert.</u>

16   <u>denied,</u> 527 U.S. 1038 (1999).  Breach of this implied term will give rise to contract damages,

17   just like a breach of contract action.  Where a "special relationship" exists between the parties,

18   such as between an insurer and insured or franchisor and franchisee, the damaged party may

19

20

21

22

23

24   _____
    [14]     Even if there were no such per se rule against recovering for negligently inflicted emotional distress
25   allegedly arising out of pecuniary loss, Plaintiffs' claim would remain insufficient as a matter of law.  The
    damages claimed are not reasonably foreseeable in a contractual, investment setting, and therefore the Nevada
26   Supreme Court would not permit their recovery as a matter of law under these alleged facts.  In *Crippens v. Sav-
    On Drug Stores*, 114 Nev. 760, 961 P.2d 761 (1998), the Court noted, "The majority of the cases on negligent
27   infliction of emotional distress have involved automobile accidents, including *Eaton*."  *Id.* at 762 (referring to
    *State v. Eaton,* 101 Nev. 705, 710 P.2d 1370 (1985), the seminal "bystander" case).  The Court explained that
28   although this tort is not strictly limited to accident cases, "The overall circumstances must be examined to
    determine whether the harm to the plaintiff was reasonably foreseeable.  Foreseeability is the cornerstone of this
    court's test for negligent infliction of emotional distress." *Crippens*, 114 Nev. at 763.

LAXALT & NOMURA.
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

1  sue in tort and potentially recover punitive damages.[15]  However, an element of this cause of

2  action is the existence of a contract between the plaintiff and defendant.  *Perry v. Jordan*, 111

3  Nev. 943, 948, 900 P.2d 335 (1995).

4         As set forth above, neither Ms. Tierney nor TCG were parties to the contract.  With

5  respect to CMS, there is no case law suggesting that the Nevada Supreme Court would permit

6  tort-based damages for breach of the covenant of good faith and fair dealing, based upon a

7
8  "special relationship" such as exists between and insurer and an insured, in the context of an

9  arms-length private investment.  With respect to the recovery of contract-based damages,

10  Plaintiffs have failed to plead facts demonstrating that CMS has even breached any of the terms

11  of the subject note because the due date has not yet passed, and there is no allegation that

12  Plaintiffs delivered the note to CMS in connection with a demand for conversion to CMS

13  common stock.  (Ex. A, sec. 2.d)

14
       **10.    Deceptive trade practices (NRS Ch. 598).**
15

16         The statutory scheme of NRS 598 provides for actions to be investigated and prosecuted

17  by the Commissioner of Consumer Affairs, the Director of the Department of Business and

18  Industry, the Attorney General and/or the District Attorney.  See NRS 598.0957 et. seq.

19  However, NRS 598.0977 entitled "Civil action by elderly or disabled person against person

20  who engaged in deceptive trade practice; remedies" provides:

21
              If an elderly or disabled person suffers damage or injury as a result of a
22            deceptive trade practice, he or his legal representative, if any, may commence a
              civil action against any person who engaged in the practice to recover the actual
23            damages suffered by the elderly or disabled person, punitive damages, if

24

25  _____
    [15]     "Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for
26  breach of the covenant arises only 'in rare and exceptional cases' when there is a special relationship between the
    victim and tortfeasor." *Insurance Co. of The West v. Gibson Tile Co.,* 112 Nev. Adv. Rep. 40 at 10-11, 134 P.3d
27  698, 702 (2006). "Examples of special relationships include those between insurers and insureds, partners of
    partnerships, and franchisees and franchisers. Each of these relationships shares 'a special element of reliance'
    common to partnership, insurance, and franchise agreements. We have recognized that in these situations
28  involving an element of reliance, there is a need to 'protect the weak from the insults of the stronger' that is not
    adequately met by ordinary contract damages." *Id.*

1    appropriate, and reasonable attorney's fees. The collection of any restitution
     awarded pursuant to this section has priority over the collection of any civil
2    penalty imposed pursuant to NRS 598.0973.

3    Although this statute provides a limited private right of action, Plaintiffs have not pled

4    that they are either elderly[16] or disabled.[17]  Certainly, the actual party to the agreement --- the

5    incorporeal Lear Family Trust --- cannot be regarded as elderly or disable.  Therefore, Plaintiffs

6    have no standing to bring such a claim against Defendants.
7
         **11.    Racketeering.**
8
9    In their Eleventh Cause of Action, Plaintiffs allege generally that Defendants' actions

10   constitute "racketeering" under "18 USCA Sec. 1961, et seq."  (Complaint, para. 67)  Any

11   claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") must specify

12   the subsections of 18 U.S.C. § 1962 under which it is proceeding.  See *Washington v.*

13   *Baenziger*, 656 F. Supp. 1176, 1178 (D. Cal. 1987).  Plaintiffs have not alleged what subsection
14
     of 18 U.S.C . § 1962 they are proceeding under, which is fatal to this claim.
15
16         **a.    Plaintiffs do not allege that an "enterprise" existed.**

17   The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a

18   pattern (4) of racketeering activity (known as "predicate acts") (5) causing injury to the

19   plaintiff's business or property." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) *citing* 18

20   U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. IMREX Co.*, 473 U.S. 479, 496 (1985).
21
     Plaintiffs' complaint fails to allege the requisite elements of a civil RICO claim and
22
23   suffers from a complete "absence of sufficient facts alleged under a cognizable legal theory."

24   *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988).  The complaint does not

25   allege that an "enterprise" existed as required by 18 U.S.C. § 1964.  Under 18 U.S.C. § 1961(4)

26
     ---
     [16]    Defined as 60 or older . NRS 598.0933.
27
     [17]    Defined as a physical or mental impairment that substantially limits one or more of the major life
28   activities of the person.  NRS 598.093.

1  an "enterprise" includes "any individual, partnership, corporation, association, or other legal

2  entity, and any union or group of individuals associated in fact although not a legal entity." An

3  associated-in-fact enterprise is "a group of persons associated together for a common purpose

4  of engaging in a course of conduct." *Odom v. Microsoft Corp.*, ____ F.3d ____; 2007 U.S.

5  App. LEXIS 10519 (9th Cir. 2007).  Plaintiffs must allege facts supporting "evidence of an

6  ongoing organization, formal or informal," and "evidence that the various associates function

7
   as a continuing unit." *Id.* quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981).
8

9  Plaintiffs' complaint alleges nothing regarding enterprise, and accordingly dismissal is

10  appropriate.

11
           **b.     Plaintiffs fail to allege the occurrence of two or more predicate
12                   acts.**

13         Plaintiffs allege that "at least two predicate acts (common law fraud and misuse of

14  monies and property, all unrelated to securities transactions)" exist.  This is patently insufficient

15  to state a claim for relief under the civil RICO statute, as the alleged fraud and misuse of

16  monies and property (each of which, in turn, is subject to dismissal) revolve around a single

17  "transaction".
18

19         The definition of a "pattern of racketeering activity" requires "at least two acts of

20  racketeering activity." 18 U.S.C. § 1961(5); see *Sedima v. Imrex Co.*, 473 U.S. 479, 497 (1985).

21  The relevant question is whether, assuming the truth of the allegations in the complaint, the

22  RICO defendants could have been indicted for more than one predicate offense.

23         Plaintiffs' RICO claims rest upon a single transaction and thus the "threat of continued

24  criminal activity" required by *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989), is

25  missing. Under *H.J.*, to prove a pattern a plaintiff "must show that the racketeering predicates

26  are related, and that they amount to or pose a threat of continued criminal activity." *H.J.*, 492

27  U.S. at 239.
28

In *Newman v. Comprehensive Care Corp.*, 794 F. Supp. 1513, 1526 (D. Or. 1992), the Court granted a motion to dismiss on civil RICO claims because the plaintiffs could not allege a "pattern." The plaintiffs could only point to a single transaction --- a failed corporate merger --- on which to base their "threat of continued criminal activity." The court rightly found this insufficient to state a claim for relief under RICO.

Likewise in the present case, Plaintiffs point to only one transaction on which to premise a "threat of continued criminal activity" --- the Lear Family Trust's investment of $250,000 with CMS. This is insufficient to establish a "pattern" as required by *H.J.* Simply put, the complaint alleges a single transaction, not the requisite two or more predicate acts.[18] Accordingly, dismissal is appropriate.

**12.   Interference with contracts.**

"In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274, 71 P.3d 1264 (2003). "[M]ere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant <u>intended to induce the other party to breach the contract with the plaintiff</u>." *Id.* at 276 (emphasis supplied).

Plaintiffs' claim fails on multiple fronts: They have failed to allege <u>facts</u> demonstrating a specific contract between Plaintiffs and a third party; and more importantly they have failed to allege that any of the moving Defendants both <u>knew</u> of this unnamed contract and <u>intended</u>

---

[18]     Courts have consistently held that each sale of a security constitutes a separate offense. See *United States v. Naftalin*, 606 F.2d 809, 810 (8th Cir. 1979).

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

1  to induce the other party to breach the contract with Plaintiffs.  This claim must be dismissed as

2  to all moving Defendants.

3     **13.    Interference with prospective economic advantage.**

4     The following elements must be proven to establish the tort of interference with

5  prospective business advantage: "(1) a prospective contractual relationship between the

6  plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the

7

8  intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or

9  justification by the defendant; and, (5) actual harm to the plaintiff as a result of the defendant's

10  conduct." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311,

11  971 P.2d 1251 (1998).

12     Once again, Plaintiffs have failed to allege <u>facts</u> demonstrating a specific prospective

13  contractual relationship between Plaintiffs and a third party, or that one or more of the moving

14  Defendants <u>intended</u> to preclude the formation of such a contract.  This claim must be

15

16  dismissed as to all moving Defendants.

17     **14.    Conspiracy.**

18     An actionable civil conspiracy is a combination of two or more persons who, by some

19  concerted action, intend to accomplish some unlawful objective for the purpose of harming

20  another which results in damage.  *Collins v. Union Federal Sav. & Loan*, 99 Nev. 284, 662 P.2d

21  610 (1983).  "To state a cause of action for conspiracy, the complaint must allege: 1) the

22  formation and operation of the conspiracy; 2) the wrongful act or acts done pursuant thereto;

23

24  and 3) the damage resulting from such act or acts." *Ungaro v. Desert Palace, Inc.*, 732 F.Supp.

25  1522, 1532 (D. Nev. 1989).  "The *sine qua non* of a conspiratorial agreement is the knowledge

26  on the part of the alleged conspirators of its unlawful objective and their intent to aid in

27  achieving that objective.  The alleged facts must show either expressly or by reasonable

28

1  inference that <u>Defendant had knowledge of the object and purpose of the conspiracy</u>, that there

2  was an <u>agreement to injure the Plaintiff</u>, that there was a <u>meeting of the minds on the objective</u>

3  <u>and course of action</u>, and that as a result <u>one of the defendants committed an act resulting in the</u>

4  <u>injury</u>." *Id.* (internal citations omitted) (emphasis added).[19]

5      Plaintiffs' complaint, coupled with the plain language of the convertible note, can only

6  be interpreted as alleging that CMS and the other Defendants somehow utilized the $250,000

7
8  which the Lear Family Trust loaned CMS in a manner not to the Plaintiffs' liking, such that

9  they want the Trust's investment back more than four years before payment becomes due. Yet

10  they have failed to alleged any <u>facts</u> demonstrating, either expressly or by reasonable inference,

11  the object of the supposed conspiracy, that either CMS, Ms. Tierney, or TCG had "knowledge"

12  of the "object and purpose of the conspiracy," or that there was "an agreement to injure" the

13  Plaintiffs and that as a result one of the moving Defendants committed an act resulting in the

14
15  injury. *Ungaro,* 732 F.Supp. at 1532. Plaintiffs cannot convert a failed breach of contract claim

16  into a more exotic "conspiracy" simply by postulating vague, unsubstantiated involvement in

17  an alleged "scam" by a number of non-parties to the contract.

18  **15/16. Declaratory relief, injunctive relief, and accounting.**

19      Plaintiffs loaned CMS a sum of money, the repayment of which is not due until

20  September 30, 2011. (Ex. A, sec. 1) They have not alleged that the Lear Family Trust has

21  demanded that the repayment of the funds be converted into an immediate transfer of stock.

22
23  (Complaint, *passim*, Ex. A, For the same reasons that Plaintiffs' breach of contract claim fails

24

[19] The Court is entitled to look behind the bare allegations of the complaint, at least to some degree. For
25  example, in *Ungaro* the Court explained as follows while analyzing the plaintiff's allegation that the alleged
conspirators had a "purpose to harm" the plaintiff: "Merely because Caesars did not choose to protect its
26  employees' rights by requiring proper IRS procedures does not reasonably lead one to conclude that it had a
'purpose to harm' the employees. On the contrary, Plaintiff's allegation that Caesars acted as it did in order to
27  avoid bad employer / employee relations reasonably implies a act of intent to injure the employees. A person
seeking to have good relations with someone usually does not also intend to injure that other person since injury to
28  that other person would hamper good relations." 732 F. Supp. at 1532.

1  as pled, their request for declaratory relief must fail as well.  Further, Plaintiffs cannot establish

2  the need for an accounting, because they have failed to plead <u>facts</u> (as opposed to conclusions)

3  raising an issue as to whether the monies for which they wish to account are being improperly

4  held by Defendants.

5  **E.      Conclusion.**

6      For the reasons set forth above, the moving Defendants respectfully pray for the Court's

7
   order dismissing Plaintiffs' Complaint without leave to replead for failure to state a claim on
8
9  which relief can be granted.  To the extent the Court allows and claims to survive, it should

10 order Plaintiff to set forth a more definite statement of those claims.

11      DATED this 21st day of May, 2007.

12                                      LAXALT & NOMURA, LTD.

13

14                                 By:

15                                      Daniel T. Hayward, Esq. #5986
                                        Michael Large, Esq. #10119
16                                      9600 Gateway Drive
                                        Reno, Nevada  89521
17                                      Tel:  (775) 322-1170
                                        Fax: (775) 322-1865
18

19

20

21

22

23

24

25

26

27

28

LAXALT & NOMURA,
ATTORNEYS AT LAW
9600 GATEWAY DRIVE
RENO, NEVADA 89521

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I hereby certify that I am an employee of LAXALT & NOMURA, LTD., and that on the 21 day of May, 2007, I caused to be served a true and correct copy of the foregoing by:

☒ E-Service

☐ Mail on the parties listed below in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At the Law Offices of Laxalt & Nomura, mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

☐ Personal delivery by causing a true copy thereof to be hand delivered this date to the address(es) at the address(es) set forth below.

☐ Facsimile on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

☐ Federal Express or other overnight delivery.

☐ Reno/Carson Messenger Service

addressed as follows:

Michael J. Morrison, Esq.
1495 Ridgeview Drive, Suite 220
Reno, Nevada 89509
Telephone: (775) 827-6300
Facsimile: (775) 827-6311

An employee of Laxalt & Nomura, Ltd.